**C. Helmer Johnson, Administrator, Appellee, v. City of Chicago, et al., on appeal of City of Chicago, Appellant.**

### Gen. No. 17,015.

1. BRIDGES—*licensees.* Where plaintiff's intestate, a boy of nine years of age, while crossing a bridge of a city, was called upon by the bridge tender to assist in turning the bridge, and, because of the defective condition of the bridge and its machinery and abutments a collision with a steamer resulted, the fact that plaintiff's intestate might have gotten across the bridge but returned at the request of the bridgeman did not make him a mere licensee, and he was entitled to the same degree of care which the city owes those using its highways in the ordinary manner.

2. INFANTS—*playing on highway.* Children may play upon the highway, and a city is liable for its negligence if a child while playing should, without any fault on its part, be injured by reason of a defect in the highway.

3. INFANTS—*contributory negligence of.* Whether the conduct of plaintiff's intestate, a boy of nine years, at the time of an accident, amounted to contributory negligence, is for the determination of the jury.

Appeal from the Superior Court of Cook county; the Hon. ROBERT W. WRIGHT, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Affirmed. Opinion filed March 13, 1913.

EDWARD J. BRUNDAGE and CLYDE L. DAY, for appellant; GEORGE L. REKER, of counsel.

GALLAGHER & MESSNER, for appellee.

MR. JUSTICE McSURELY delivered the opinion of the court.

On May 22, 1907, Arthur Zelmansky, a boy of nine years of age, lost his life in connection with a collision between a steamboat and a bridge crossing the Chicago River. Suit was brought against the City of Chicago, the Gilchrist Transportation Company, and the Dunham Towing & Wrecking Company, resulting in a verdict of not guilty as to the Dunham Company, and of guilty as to the other defendants and assessing damages at $3,600. Before judgment the Gilchrist Company paid plaintiff $600, leaving a judgment for $3,000 against the City, from which this appeal is taken.

The occurrence resulting in the death of Arthur Zelmansky, hereinafter called plaintiff, was as follows: At the point where Kinzie street crosses the Chicago River the City maintained a wooden bridge, which operated on a center pier in the middle of the river, the bridge being operated by hand power by lever, and usually turned by one man. The bridge had been constructed for many years and is described as "old fashioned." Protection piles were constructed from the center pier on which the bridge revolved out to a point about two feet beyond a perpendicular dropped from the side of the bridge as it stood when open to permit navigation. There is testimony that these piles were in a very dilapitated condition, that they were very rotten; while one witness testified that the pilings and abutments supporting and protecting the bridge were entirely gone, all but one row of piles. Experts testified that the bridge should have had solid protecting piles projecting beyond the sides of the bridge when it was swung. There is considerable testimony that these piles were weak and would not resist any pressure. On the day in question a steamboat was coming down the river from the north, traveling south in tow of a tug boat. At this time plaintiff, with six youthful companions, was crossing the bridge from west to east. Just about the time they arrived at the

west end of the bridge the bell was rung to warn travelers that the bridge was going to be opened to permit passage of the steamer. The boys hastened across the bridge, and one of them reached the easterly shore. The others were still a few feet from it when the bridge tender called upon them to assist in turning the bridge. The bridge was turned by means of a lever, some 16 or 18 feet long, and the boys joined in the work. The bridge should have been turned so that its body would be parallel with the course of the river and resting within the protecting piles, but this was not done, and its then southerly extremity was permitted to project over the protecting piling, and into the channel of the river through which the steamer was coming. The officers of the steamer, evidently foreseeing a collision, slowed down the speed of the boat to about one mile an hour and called to the bridge tender to straighten the bridge, but before this could be done the steamer came in contact with the piling around the bridge. The piles gave way and the steamer struck the bridge, which swayed, rocked and swung around, the southerly end of the bridge swinging towards the east and the northerly end toward the west, so that it projected over the deck of the steamer about six feet and came in contact with the deck house. The collision was severe, some of those on the bridge being knocked down, and one of them rendered unconscious. At this time the boys were standing on the bridge, and one of them testifies that he thought the bridge was going into the river, as it was "tottering that way." There is testimony that a police officer stationed at the bridge called to the boys to jump to the boat. The boys did jump, and all of them made it in safety except plaintiff, who was the last to jump. One of his feet struck the rail of the steamer, and he fell into the river and was drowned.

Plaintiff's declaration and original counts were upon the theory that the City was negligent in allow-

ing the protecting piles to become so rotted and out of repair, and also that its servants so carelessly managed the bridge that thereby the collision took place. No contention is made that the City was not negligent in regard to the maintenance and operation of the bridge, and that this negligence did not proximately contribute to the accident. It is further conceded that ordinarily such a bridge is part of the highway, and that if the boys could not have gotten off the bridge but were marooned, they could still claim the same degree of protection as if they were on a highway. But it is argued that when the boys might have gotten across before the bridge started to swing, but returned at the request of the bridgeman, they became mere licensees and not entitled to the same degree of care which the City owes those who use its highways in the ordinary manner. We are referred to no decisions which so hold, and following what seems to us the better reasoning, we are not disposed to assent to this claim.

It has been repeatedly held that children may play upon the highway, and that the City would be liable for its negligence if a child while playing should, without any fault on his part, be injured by reason of a defect in the highway. City of Chicago v. Keefe, 114 Ill. 222; Village of Bath v. Blake, 97 Ill. App. 35; City of Waverly v. Reesor, 93 Ill. App. 649. The swinging of the bridge did not lessen the degree of care owed by the City to plaintiff, and if plaintiff met his death through the negligence of the City as alleged in plaintiff's declaration, and plaintiff was not guilty of contributory negligence, the City is liable.

It is urged that plaintiff was guilty of contributory negligence. He was nine years of age and was there in the company of older companions and followed their lead. His remaining on the bridge with the other boys in response to the request of the bridge tender was a very natural thing to do. When the bridge was

struck it shook violently, and there is testimony that the police officer shouted to the boys, "Jump for your lives!" Whether the conduct of plaintiff, of such tender years, both before and after the bridge was struck amounted to contributory negligence was for the jury to determine, and we cannot say that its conclusion was wrong.

The judgment will be affirmed.

*Affirmed.*